UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID MAC, individually, and on
behalf of all others similarly situated,

          Plaintiffs,

v.

BLUE CROSS BLUE SHIELD OF
MICHIGAN and DÜRR SYSTEMS,
INC.,

          Defendants.

_____/

Case No. 16-cv-13532

Paul D. Borman
United States District Judge

## OPINION AND ORDER DENYING
## DEFENDANTS' MOTION TO DISMISS (ECF NO. 13)

In this ERISA benefits action, Defendants have moved to dismiss Plaintiff's

Complaint, prior to this Court's receipt of the administrative record, arguing that

Plaintiff mounts an impermissible challenge to the design of his employer's plan,

rather than a challenge to the implementation of the terms of that plan. The matter

is fully briefed and the Court held a hearing on May 2, 2017. For the reasons that

follow, the Court DENIES the motion.

## INTRODUCTION

Plaintiff David Mac files this putative class action under the Employee

Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*, seeking a

declaration that the drug that his physician has prescribed for his Idiopathic Adult Human Growth Hormone Deficiency ("IAGHD") is covered by the self-funded health benefits plan sponsored by his employer, Defendant Dürr Systems, Inc. ("Dürr"), and seeking a reversal of a denial of benefits under ERISA.[1]  Plaintiff also sues Blue Cross Blue Shield of Michigan ("BCBSM"), the third party contract administrator for the Dürr health benefits plan and the entity that issued the denial of coverage in this case.  Defendants now move to dismiss the Complaint in lieu of filing an Answer and in advance of the Court's receipt of the Administrative Record.

## I.    BACKGROUND

Plaintiff alleges in his Complaint that he is employed by Dürr, a Michigan corporation that sponsors a self-funded health and welfare benefit plan providing medical, prescription, dental and vision coverage for its employees that is subject to ERISA, ("the Dürr Plan").  (Compl. ¶¶ 5, 10; Compl. Ex. A, Third Amended and Restated Welfare Benefit Plan for Dürr Systems, Inc., Summary Plan Description,

---

[1]  At this stage of the proceedings, the Court need not address Plaintiff's class claims. Therefore, this Opinion and Order does not discuss Plaintiff's class allegations, which seek to bring class claims (against Blue Cross Blue Shield of Michigan only) on behalf of a class of "all Michigan residents whose coverage for medically necessary HGH prescriptions were improperly denied." (Complaint ¶ 56.) Any decision regarding class certification will require an in depth analysis of the Fed. R. Civ. P. Rule 23 factors. *See, e.g. Wit/Alexander v. United Behavioral Health*, 317 F.R.D. 106 (N.D. Cal. 2016) (finding that plaintiffs met the requirements for class certification under Rule 23 on their ERISA claims that defendant improperly adjudicated their requests for coverage based on overly restrictive coverage guidelines that were not consistent with generally accepted standards of care).

Effective January 1, 2015; Pl.'s Resp. Ex. 1, Dürr Plan.)   The Complaint alleges that Dürr entered into an administrative services contract with BCBSM to administer the Dürr Plan. (Compl. ¶ 11.)  Plaintiff further alleges that both Dürr and BCBSM are named fiduciaries under the Plan.  (Compl. ¶¶ 9, 12.)

Plaintiff alleges that he suffers from dysfunction of his pituitary gland that has caused him to experience a deficiency in one key pituitary hormone, somatropin or Human Growth Hormone ("HGH").  (Compl. ¶¶ 14, 17.)  According to Plaintiff's Complaint, a deficiency in HGH is called Growth Hormone Deficiency ("GHD"), and when onset occurs during adulthood and without known cause, the condition is referred to as Idiopathic [i.e. "Without Known Cause"] Adult Growth Hormone Deficiency ("IAGHD").  Plaintiff alleges that his physician documented his condition with the results of a growth hormone stimulation test and prescribed HGH in the form of Genotropin Cartridge, which is a form of somatropin administered by injection. (Compl. ¶¶ 21-23.)

The Complaint further alleges that on February 10, 2016, BCBSM issued a denial of coverage for the Genotropin ordered by his physician.  The denial was signed by "Pharmacy Services, Blue Cross Blue Shield of Michigan," and indicated:

- The coverage guidelines for your Custom Drug List benefit require criteria to be met before coverage can be authorized.

3

- Our criteria for coverage of this medication require documentation of a diagnosis of growth hormone deficiency with hypopituitarism when one of the following criteria (a or b) are met:

- a. Two pituitary hormone deficiencies (other than growth hormone) requiring hormone replacement such as TSH, ACTH, Gonadotropins and ADH and both of the following i. and ii:

- i. at least one known cause for pituitary disease or a condition affecting pituitary function, including pituitary tumor, surgical damage, hypothalmic disease, irradiation, trauma or infiltration disease (histoplasmosis, Sheehan syndrome, autoimmune hypophysitis, or sarcoidosis) is documented AND

- ii. ONE provocative stimulation less than 5 mg/ml. The insulin tolerance test is the preferred testing method. OR

- b. Three pituitary hormone deficiencies (other than growth hormone) requiring hormone replacement AND an IGF-1 level below 80 ng/ml.

(Compl. ¶ 25; Compl. Ex. B; Pl.'s Resp. Ex. 2.) Plaintiff appealed the determination, which was upheld on April 4, 2016, in a letter that essentially reiterated verbatim the reasons for denial set forth in the February 10, 2016 initial denial. (Compl. ¶ 26-27; Compl. Ex. C; Pl.'s Resp. Ex. 3.)

Plaintiff alleges in his Complaint that he has exhausted the claims process and that any further pursuit of his claim through that process would be "futile because BCBSM has an across-the-board policy and practice of denying coverage for HGH for the treatment of IAGHD." (Compl. ¶¶ 28-29.) Plaintiff alleges that "BCBSM's

criteria for coverage for Plaintiff and for the putative class does not include Adult Idiopathic Growth Hormone Deficiency, notwithstanding that it is a well-recognized medical condition in many patients with GHD." (Compl. ¶ 31.) Plaintiff alleges that BCBSM wrongfully denies coverage for the "medically necessary treatment" for his IAGHD. (Compl. ¶ 34.) Plaintiff alleges that BCBSM denied coverage based on its published "Custom Drug List." (Compl. ¶ 38.) Plaintiff alleges that "BCBSM's denial of Plaintiff's claim was arbitrary and capricious as BCBSM did not consider that the medical community recognizes an idiopathic cause for GHD. (Compl. ¶ 44.) Plaintiff alleges that "BCBSM's exclusion from coverage of IAGHD is arbitrary and capricious as the decision is not rational, based on medical evidence . . . ." (Compl. ¶ 53.) Plaintiff also alleges that he was not provided "with all of the documents required pursuant to the DSI Plan and ERISA and which he also requested." (Compl. ¶ 49.)

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a case where the complaint fails to state a claim upon which relief can be granted. When reviewing a motion to dismiss under Rule 12(b)(6), a court must "'construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff.'" *Handy-Clay v. City of*

*Memphis*, 695 F.3d 531, 538 (6th Cir. 2012) (quoting *Directv Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007)). The court "need not accept as true a legal conclusion couched as a factual allegation, or an unwarranted factual inference." *Handy-Clay*, 695 F.3d at 539 (internal quotation marks and citations omitted). *See also Eidson v. State of Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007) ("Conclusory allegations or legal conclusions masquerading as factual allegations will not suffice.").

In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court explained that "a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Id.* at 555 (internal quotation marks and citations omitted) (alteration in original). "To state a valid claim, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory." *LULAC v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007).

The Supreme Court clarified the concept of "plausibilty" in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009):

To survive a motion to dismiss, a complaint must contain sufficient

factual matter, accepted as true, to "state a claim to relief that is plausible on its face." [*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007)]. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.*, at 557 (brackets omitted).

*Id.* at 678.

Thus, "[t]o survive a motion to dismiss, a litigant must allege enough facts to make it plausible that the defendant bears legal liability. The facts cannot make it merely possible that the defendant is liable; they must make it plausible. Bare assertions of legal liability absent some corresponding facts are insufficient to state a claim." *Agema v. City of Allegan*, 826 F.3d 326, 331 (6th Cir. 2016) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

In ruling on a motion to dismiss, the Court may consider the complaint as well as (1) documents that are referenced in the plaintiff's complaint and that are central to plaintiff's claims, (2) matters of which a court may take judicial notice (3) documents that are a matter of public record, and (4) letters that constitute decisions of a governmental agency. *Thomas v. Noder-Love*, 621 F. App'x 825, 830 (6th Cir. 2015) ("Documents outside of the pleadings that may typically be incorporated

without converting the motion to dismiss into a motion for summary judgment are public records, matters of which a court may take judicial notice, and letter decisions of governmental agencies.") (Internal quotation marks and citations omitted); *Armengau v. Cline*, 7 F. App'x 336, 344 (6th Cir. 2001) ("We have taken a liberal view of what matters fall within the pleadings for purposes of Rule 12(b)(6). If referred to in a complaint and central to the claim, documents attached to a motion to dismiss form part of the pleadings. . . . [C]ourts may also consider public records, matters of which a court may take judicial notice, and letter decisions of governmental agencies."); *Greenberg v. Life Ins. Co. Of Virginia*, 177 F.3d 507, 514 (6th Cir. 1999) (finding that documents attached to a motion to dismiss that are referred to in the complaint and central to the claim are deemed to form a part of the pleadings). Where the claims rely on the existence of a written agreement, and plaintiff fails to attach the written instrument, "the defendant may introduce the pertinent exhibit," which is then considered part of the pleadings. *QQC, Inc. v. Hewlett-Packard Co.*, 258 F. Supp. 2d 718, 721 (E.D. Mich. 2003). "Otherwise, a plaintiff with a legally deficient claims could survive a motion to dismiss simply by failing to attach a dispositive document." *Weiner v. Klais and Co., Inc.*, 108 F.3d 86, 89 (6th Cir. 1997).

## III. ANALYSIS

Plaintiff brings a claim for relief under § 1132(a)(1)(B), which allows a plan participant "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).[2] Plaintiff claims that Genotropin is a prescription medication that is covered under the Dürr Plan and that the decision to deny coverage in Plaintiff's case because he failed to meet "additional conditions," as expressed in the letters of denial, was arbitrary and capricious. (Pl.'s Resp. 12.) Indeed, Genotropin *is* a drug that appears on BCBSM's "Custom Drug List," which both parties appear to concede is incorporated into the Dürr Plan.[3] Defendants respond that the "additional conditions" to which Plaintiff refers are in fact "clinical

---

[2] Plaintiff's Complaint does not specify the subsections of § 1132(a) under which he proceeds, but his Response clarifies that he seeks relief under § 1132(a)(1)(B) for a denial benefits due under the plan terms and under § 1132(a)(3), a "catch all" provision for relief not otherwise available under ERISA. Plaintiff also suggests a claim under § 1133, asserting that Defendants failed to provide him with information required under the Dürr Plan.

[3] The Custom Drug List, while referred to in Plaintiff's Complaint as the basis on which BCBSM "upon information and belief" denied coverage, is not attached to Plaintiff's Complaint. However, the "Custom Drug List" is central to Plaintiff's claims because it is the basis for Plaintiff's claim that Genotropin was a covered drug under the Dürr Plan. Thus, the Court can consider the Custom Drug List, which in any event is incorporated into the Dürr Plan, in deciding this motion to dismiss. However, and notably, the "coverage criteria" on which BCBSM based its denial are not published in the Custom Drug List and appears in the present record only as quoted in the text of the BCBSM denial letters, which are attached to Plaintiff's Complaint.

coverage criteria" that are "terms of the Dürr Plan" and further respond that Plaintiff

concedes that he does not satisfy these criteria. Plaintiff does appear to concede in

his Complaint that he does not meet this "coverage criteria" because his AGHD is

"idiopathic," i.e. without known cause. At the May 2, 2017 hearing on this motion,

counsel for Plaintiff acknowledged that Plaintiff does not have the "condition" as it

is limited in the letters he received.

In his Response, however, Plaintiff denies that he has acknowledged that

BCBSM's "denial of his claim was *consistent* with the Plan's 'criteria coverage.'"

(Pl.'s Resp. 11) (emphasis in original). Plaintiff insists in his Response that he

"never states or even infers that the Plan itself specifies that Genotropin Cartridge for

the treatment of AIGHD is not a covered benefit." (Pl.'s Resp. 11.) In support of this

statement, Plaintiff offers the following "evidence" of an apparent inconsistency

between the denial and the Dürr Plan terms:

- *Genotropin is listed as an available pharmaceutical on the BCBSM "2017 Custom Drug List."* (Pl.'s Resp. Ex. 4, Custom Drug List 53, PgID 250.)[4]

---

[4] This is a true but incomplete statement because the drug is listed in the Custom Drug List as an approved drug requiring "PA," or Prior Approval. Prior Approval is explained in the Custom Drug List as follows: "Prior approval may be necessary for coverage of certain medications. In these cases, the member must meet clinical criteria or additional information must be provided before coverage is approved. Clinical criteria are based on current medical information and approved by our Pharmacy and Therapeutics Committee." (Pl.'s Ex. 4, Custom Drug List 10, PgID

- *[Genotropin] is also listed as a "specialty drug" in Defendant BCBSM's "Specialty Drug Program RX Benefit Member Guide." Ex. 5.* (Pl.'s Ex. 5, Specialty Drug Program, RX Benefit Member Guide 5, PgID 296.)[5]

- *Genotropin is not listed on BCBSM's "Drug List exclusions for Blue Cross Commercial Plans."*

- *The "2016 Enrollment Benefits Roadmap" for Dürr Systems, Inc. does specify any limitations.* (Pl.'s Mot. Ex. 7.)[6]

In the end, this collection of "evidence" ultimately circles back to the Prior Approval notation for the drug Genotropin in the Custom Drug List and the explanation in the Custom Drug List that Prior Approval will require the member to meet "clinical coverage criteria" that "are based on current medical information and approved by [BCBSM's] Pharmacy and Therapeutics Committee in order to obtain coverage." (Pl.'s Resp. Ex. 5, PgID 207, 211) (alteration added).

The essence of Defendants' argument in this motion is that these "coverage criteria," which presumably are those criteria set forth in the April 4, 2016 Denial

---

207.)).

[5] The noted "Exhibit 5" states at the header of the List on which Genotropin appears: "Coverage for these drugs will vary based on your Rx benefit. See your plan's drug list for specific coverage details."

[6] The noted Exhibit 7 is a 60 page document that, as far as the Court can discern, does not mention any specific drugs one way or the other. Indeed, the page indicated in the Table of Contents as pertaining to Prescription Drugs, page 11, appears to be missing from Exhibit 7.

Letter sent to Plaintiff, were Dürr Plan terms and that in denying Plaintiff's claim for benefits, Defendants merely enforced the terms of the Dürr Plan as written, i.e. applied the governing coverage criteria (Plan terms according to Defendants that Plaintiff concedes he could not satisfy) to deny Plaintiff's claim for benefits, and therefore Plaintiff cannot establish that Defendants violated any term of the Dürr Plan. In support of this argument, Defendants assert that ERISA does not require employers to provide any health benefits at all and does not mandate what benefits they must provide if they do choose to sponsor a benefit plan. *See, e.g., Pegram v. Herdrich*, 530 U.S. 211, 226-27 (2000) ("'Nothing in ERISA requires employers to establish employee benefit plans. Nor does ERISA mandate what kind of benefits employers must provide if they choose to have such a plan.'") (quoting *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996)). And Defendants are correct that claims under § 1132(a)(1)(B) necessarily must seek to enforce plan terms, not rewrite them. As the Sixth Circuit recently observed:

> It should be pointed out that we would just as likely dismiss Plaintiffs' argument on the merits as well. In *CIGNA Corp. v. Amara*, the Supreme Court made clear that § 1132(a)(1)(B) does not afford a court any "authority to reform [a] plan as written." 563 U.S. 421, 438, 131 S.Ct. 1866, 179 L.Ed.2d 843 (2011). "The statutory language speaks of enforcing the terms of the plan, not of changing them." *Id.* at 436, 131 S.Ct. 1866. By arguing that the terms of the Plan do not comply with the law, Plaintiffs tacitly concede that the relief they seek exists outside the scope of their plan. And an action attempting to re-write the terms of a

plan is unavailable under § 1132(a)(1)(B). *See Pender v. Bank of Am. Corp.*, 788 F.3d 354, 361–62 (4th Cir. 2015) (holding that a cause of action could not be advanced under § 1132(a)(1)(B) when the plaintiffs sought to enforce the plan "not as written, but as it should properly be enforced under ERISA.").

*Soehnlen v. Fleet Owners Ins. Fund*, 844 F.3d 576, 583 n. 2 (6th Cir. 2016).

Defendants argue that the decision to limit the availability of Genotropin under the Dürr Plan through the clinical coverage criteria requirement was a matter of plan design and thus cannot be challenged under § 1132(a)(1)(B). Defendants assert that in denying Plaintiff's claim BCBSM was merely enforcing the terms of the Dürr Plan, and thus Plaintiff's claim is not one challenging plan interpretation or implementation (permissible under § 1132(a)(1)(B)) but rather one challenging plan design (impermissible under § 1132(a)(1)(B)). Defendants assert that Plaintiff's failure to identify a single Dürr Plan term with which Defendants have failed to comply is fatal to his claim under § 1132(a)(1)(B).

But Plaintiff disputes that the "coverage criteria" that were applied to deny his claim are "Dürr Plan terms" and disputes that these coverage criteria are consistent with the Dürr Plan term that expressly covers the prescription drug Genotropin that his physician has ordered. At this pleading stage, and on this limited record, as discussed more fully below, the Court cannot conclude as a matter of law that the coverage criteria applied to deny Plaintiff's claim were "Dürr Plan terms," or that the

Plaintiff has failed to identify a possible conflict between those coverage criteria and a Dürr Plan term.

Defendants rely on *Jones v. Kodak Medical Assistance Plan*, 169 F.3d 1287, 1292 (10th Cir. 1999) to support their argument that the coverage criteria imposed in connection with Plaintiff's coverage determination were "Dürr Plan terms" that are unreviewable under § 1132(a)(1)(B). In *Jones*, plaintiff's wife (plaintiff was the plan participant) was denied coverage for inpatient alcohol treatment. Under the ERISA plan at issue in *Jones*, treatment for mental health and substance abuse problems was subject to pre-certification requirements, and the plan expressly required prior approval for treatment coverage. 169 F.3d at 1289-90. The plan informed plan participants that expenses for services and items deemed to be medically unnecessary, experimental, or investigational were not covered. *Id.* at 1290. The self-funded plan appointed American PsychManagement ("APM") to manage the review process under which the medical appropriateness of substance abuse treatment is assessed. *Id.* APM determined medical appropriateness of substance abuse treatment according to six criteria, three of which the patient must meet before coverage would be approved. *Id.* Mrs. Jones did not meet the three mandatory criteria and APM denied pre-certification for her inpatient treatment. *Id.* The Tenth Circuit affirmed the district court's determination that "the unpublished APM criteria were part of the Plan's term

14

and, hence, that it could not review them." *Id.* at 1292. The court of appeals reasoned that "the Plan Summary expressly authorized APM to determine eligibility for substance abuse treatment according to its own criteria . . . [and] [t]he APM criteria did not need to be listed in Plan documents to constitute part of the Plan." *Id.* Because the court "consider[ed] the APM criteria a matter of Plan design and structure, rather than implementation," it determined that the coverage denial was unreviewable under ERISA. The Tenth Circuit affirmed the denial of coverage, reiterating the well-established principle that "ERISA does not mandate that employers provide any particular benefits," and that therefore "an employer may draft a benefits plan any way it wishes."

*Jones* does appear to be persuasive authority for the proposition that clinical coverage criteria, like the criteria required for prior approval of Genotropin, can become "plan terms" and thus denials pursuant to them can become unreviewable under § 1132(a)(1)(B). However, *Jones* was persuasively distinguished in *Alexander v. United Behavioral Health*, No. 14-cv-05337, 2015 WL 1843830, (N.D. Cal. April 7, 2015), a case that this Court finds instructive here, at least based on the minimal record presently before the Court. In *Alexander*, the court distinguished *Jones* as (1) involving a claim against the plan sponsor and not the plan administrator (Plaintiff sues both here), and (2) involving criteria that were determined to have been

15

incorporated into the plan. The plaintiffs in *Alexander* argued that the plan administrator, UBH, "promulgat[ed] improperly restrictive guidelines that are inconsistent with the terms of their plans and improperly den[ied] coverage of residential treatment for mental health and substance abuse on the basis of those guidelines." *Id.* at *2. UBH argued, as Defendants argue here, that "in adopting these guidelines it did not act as a fiduciary but rather, as a "settlor," because the guidelines are terms of the Plans themselves," and moved to dismiss relying on *Jones*:

> UBH relies heavily on *Jones v. Kodak Medical Assistance Plan*, 169 F.3d 1287, 1292 (10th Cir.1999), but that case is distinguishable. In *Jones*, a plan participant sued a welfare benefits plan covered by ERISA for improper denial of benefits relating to inpatient substance abuse treatment. 169 F.3d at 1290. The claim was denied on the basis of internal criteria created by the plan administrator. *Id.* The plaintiffs sued the plan, challenging the criteria used by the administrator on the basis that they were arbitrary and capricious; however, the court found on summary judgment that the criteria were "a matter of Plan design and structure, rather than implementation" and therefore, were not subject to judicial review. *Id.* at 1292. In reaching this conclusion, the court acknowledged that the criteria were not included in the Plan Summary but reasoned that requiring disclosure of these "particularized criteria for determining the medical necessity of treatment for individual illnesses" would "frustrate the purpose of a summary." *Id.* The court further found that to the extent that "the Plan Summary expressly authorized [the administrator] to determine eligibility for substance abuse treatment according to its own criteria [ ][t]he [administrator's] criteria did not need to be listed in Plan documents to be part of the Plan." *Id.*

2015 WL 1843830 at *7 (alterations in original). The court then distinguished *Jones*:

> Here, in contrast to *Jones*, Plaintiffs have sued the administrator of their

Plans, not the Plan sponsors. While a plan can act as a settlor, setting the terms of coverage and determining the scope of the plan, it is less clear that a third-party administrator can play that role. . . . *Jones* also appears to be distinguishable to the extent that the court in that case found that the criteria at issue were expressly incorporated in the plan. Although the *Jones* court does not provide the specific Plan language that it found gave rise to incorporation of the administrator's criteria as plan terms, the Court agrees with Plaintiffs that the language in the Plans at issue here does not support the conclusion that the LOCs and CDGs were incorporated into the Plans. Not one of the Plans even refers to UBH's CDGs. Nor does the vague reference to "levels of care" in the Alexander and Haffner Plans suggest any intent to incorporate those guidelines into Plaintiffs' Plans.

2015 WL 1843830, at *7-8. The court reasoned that because the explicit plan terms

required the level of care guidelines to be developed based on the "reasonable"

judgment of the plan administrator consistent with "generally accepted standards of

care," adoption of those guidelines necessarily required the exercise of discretion and

therefore constituted a discretionary act, reviewable under ERISA. In reaching this

conclusion, the court cited *Egert v. Conn. Gen'l Life Ins. Co.*, 900 F.2d 1032, 1037

(7th Cir. 1990), in which the Seventh Circuit reviewed a denial of coverage by

Connecticut General, the plan administrator for a self-funded ERISA plan, for in vitro

fertilization ("IVF") procedures. To administer the benefits program, Connecticut

General had compiled internal memoranda, referred to as Current Claims Practices

or "CCP," outlining how the plan should be applied to certain circumstances,

including coverage for infertility treatments. The CCP clearly instructed Connecticut

General to deny all expenses for IVF claims. The Seventh Circuit reasoned:

> There is little question that the CCP clearly instructs Connecticut General's offices to deny IVF claims: "All expenses relative to the following procedures should be denied as not essential and necessary care and treatment of an illness, injury or covered pregnancy.... 2) INVITRO FERTILIZATION AND EMBRYO TRANSFER." Appendix C at 7511/94 (emphasis removed). Nonetheless, the treatment of IVF claims by the CCP—a compilation of secret, internal guidelines not disclosed to Canteen or to participants or beneficiaries of the Plan—is not dispositive here. The CCP is not the Plan: it is simply a set of memoranda designed to provide guidance to those interpreting the Plan. We therefore must determine whether this guidance forbidding reimbursement for IVF treatments is consistent with the terms of the Plan.
>
> We have held that firms like Connecticut General cannot adopt any guidelines they choose and then rely upon these guidelines with impunity; rather, they may rely only upon those guidelines that reasonably interpret their plans. For example, in *Reilly v. Blue Cross & Blue Shield United of Wisconsin*, 846 F.2d 416 (7th Cir.), cert. denied, 488 U.S. 856, 109 S.Ct. 145, 102 L.Ed.2d 117 (1988), we concluded that a Plan could not grant complete discretion to an internal advisory committee to pick and choose which claims would be reimbursed: "ERISA's provisions do not permit such potential abuses; decisions and their rationales are reviewable [for reasonableness]." *Id.* at 423. The focus of our inquiry, as suggested previously, must be on the reasonableness of Connecticut General's interpretation in the CCP of the Plan itself.

> *    *    *

> Even if Connecticut General acts "unreasonably" by allowing one form of treatment that permits conception while disallowing another, that by itself does not violate the Plan in effect here between Canteen and the Plan's participants. Indeed, Kraft–Egert admits that Connecticut General can act "unreasonably" in just this way, so long as Connecticut General

"specifically excludes" reimbursement for IVF treatments in the Plan. The only question we need address regarding "reasonability" is whether, in the absence of specific Plan language, Connecticut General reasonably denied Kraft–Egert's reimbursement claim for IVF treatments.

900 F.2d at 1036-37 (footnote omitted).

The Sixth Circuit, albeit in an unpublished opinion, relied heavily on *Egert* in determining whether a "corporate medical policy" regarding surgical weight loss procedures, which was developed by a plan administrator, "reasonably interpreted" the terms of the plan. *See Smith v. Health Servs. of Coshocton*, 314 F. App'x 848, 858-59 (6th Cir. 2009). The "corporate medical policy" purported to interpret terms of the plan that expressly excluded from coverage "surgery and other services primarily to improve appearance or to treat a mental and emotional [c]ondition through a change in body form (including cosmetic [s]urgery following weight loss or weight loss [s]urgery), except as specified." *Id.* at 851 (internal quotation marks omitted) (alterations in original). Although the plan language thus excluded post-weight loss surgeries that removed excess fat (panniculectomies and abdominoplasties), the "corporate medical policy" provided that an individual could establish the medical necessity of such a procedure by demonstrating certain specific clinical criteria. *Id.* The plan administrator determined that plaintiff did not sufficiently document the clinical criteria and denied coverage for her planned

panniculectomy as a non-reimbursable cosmetic procedure. *Id.* at 852. Plaintiff argued that the plan administrator acted arbitrarily and capriciously by applying the corporate medical policy to deny coverage:

> Plaintiff Smith argues that Defendant Medical Mutual acted arbitrarily and capriciously when it denied coverage for the requested panniculectomy because Medical Mutual allegedly "supplanted" the terms of the Plan with Policy # 96001, in contravention of 29 C.F.R. § 2560.503-1(b)(5). We determine that Policy # 96001 reasonably interpreted the terms of the Plan and conclude that the district court did not err in finding that Medical Mutual's use of the Policy in evaluating the medical necessity of the requested panniculectomy was appropriate and not arbitrary and capricious.
>
> According to 29 C.F.R. § 2560.503-1(g)(1)(v)(A), if an administrator makes an adverse benefit determination while relying on an internal rule or policy, "either the specific rule ... or a statement that such a rule ... was relied upon in making the adverse determination and that a copy of such rule ... will be provided free of charge to the claimant upon request[.]"
>
> A plan administrator can rely on internal rules or policies in construing the terms of an employee benefits plan only if these rules or policies reasonably interpret the plan. *See Tiemeyer v. Cmty. Mut. Ins. Co.*, 8 F.3d 1094, 1100 (6th Cir. 1993); *see also Egert v. Conn. Gen. Life Ins. Co.*, 900 F.2d 1032, 1036 (7th Cir. 1990); *May v. Roadway Express, Inc.*, 813 F. Supp. 1280, 1284 (E.D. Mich.1993). In *Egert*, the Seventh Circuit held that the administrator's reliance on internal guidelines in construing the terms of the plan rendered the ultimate benefits decision arbitrary and capricious because the guidelines were substantially inconsistent with the terms of the plan-disallowing coverage seemingly in contravention of the plan's language-"and [their use] le[ ]d to contradictory dispositions of similarly situated claims." 900 F.2d at 1038.

> Unlike the internal guidelines in *Egert*, Policy # 96001 is not inconsistent with the Plan in defining medically necessary procedures.

314 F. App'x at 858-59 (alterations in original). *See also S.M. v. Oxford Health Plans (N.Y.), Inc.*, 94 F. Supp. 3d 481, 507-08 (S.D.N.Y. 2015) (plan administrator was authorized to establish guidelines to assist with benefit determinations of "medical necessity" and such determinations were subject to arbitrary and capricious review under a "substantial evidence" standard).

Defendants assert, and reiterated multiple times at oral argument, that Plaintiff must point to a Dürr Plan term, such as "medical necessity," or "illness," that he claims Defendants have misinterpreted in denying his claim for benefits. Defendants distinguish cases such as *Egert* and *Smith* as involving just such ambiguous plan terms and assert that here Plaintiff's claim was denied not based on "medical necessity," or some similar ambiguous plan term but based on unambiguous plan terms, i.e. the medical coverage criteria, that Plaintiff concedes he does not satisfy. But of course this distinction presumes that the Court accepts Defendants' contention that the coverage criteria applied to deny Plaintiff's claim were incorporated into the Dürr Plan and were "plan terms" immune from judicial review. In this case, on this record, the Court cannot determine as a matter of law that these coverage criteria were incorporated into the Dürr Plan and became unreviewable plan terms. The Court has

no information regarding the who, what, where, and when of the creation of these coverage criteria. Indeed, other than the denial letter sent to Plaintiff, the Court has not seen a document that sets forth these "coverage criteria." Defendants assert that these criteria were incorporated into the Dürr Plan and became unreviewable "plan terms," but absent a more robust record, the Court cannot make that determination. When were these coverage criteria adopted and how were they incorporated into the Dürr Plan? Were they incorporated by amendment? How often have they been revised? Are they available to Dürr Plan participants or need they be? What are the procedures for amending the Dürr Plan and who is authorized to make such amendments?

At the May 2, 2017 hearing, counsel for Defendants knew very little about the coverage criteria that were invoked and applied to deny Plaintiff's claim and could not explain how these coverage criteria were adopted, or whether they were published somewhere or otherwise available to beneficiaries of the Dürr Plan to review. Defendants rely on *Jones*, *supra*, in support of their claim that these coverage criteria are "Dürr Plan terms," but the district court in *Jones*, and the Tenth Circuit on appeal, gave little insight into the exact plan language they deemed sufficient to incorporate the criteria at issue there into the plan as unreviewable "plan terms." Defendants in this case have simply offered insufficient evidence and argument, on the present

record at this pleading stage, to enable the Court to find as a matter of law that the BCBSM Pharmaceutical Committee had "unfettered discretion" to develop, and perhaps modify or amend these coverage guidelines, which then became new "plan terms," immunized from judicial review. *Alexander*, 2015 WL 1843830, at *8 (holding that to interpret *Jones* so broadly to, as a matter of law, convert a plan administrator's creation of internal guidelines into an act immune from judicial review would undermine the very protections afforded by ERISA).

Apart from their argument that the coverage criteria are "Dürr Plan terms," and immune from judicial review, Defendants alternatively fault Plaintiff for failing to otherwise identify a specific Dürr Plan term that has been violated by the denial of his claim. However, Defendants improperly seek to hold Plaintiff to a very parsed, isolated and literal reading of the Complaint when characterizing his claim. In fact, the allegations of the Complaint must be read as a whole and harmonized to determine whether a plausible claim has been suggested. *See Pegram*, 530 U.S. at 230 (noting that "where specific allegations clarify the meaning of broader allegations, they may be used to interpret the complaint as a whole"). At a minimum, as established in *Egert* and *Smith*, any coverage criteria must "reasonably interpret the plan," yet Plaintiff's denial letter gave no information explaining how these coverage criteria were determined or by whom – certainly nothing that would indicate to the

Plaintiff or this Court what "current medical knowledge," the standard by which additional clinical criteria are developed under the Dürr Plan, supports the adoption of these specific criteria. Plaintiff's allegation that he was wrongfully denied coverage for Genotropin (a drug that is listed as available on the Dürr Plan Custom Drug List), when read in conjunction with other allegations of Plaintiff's Complaint, such as paragraph 44 which alleges that the denial did not consider that "the medical community recognizes an idiopathic cause for GHD," and paragraph 53 which alleges that the denial of coverage for Genotropin for Plaintiff was not "based on medical evidence," plausibly suggest a claim that Defendants failed to reasonably interpret the Dürr Plan Custom Drug List Prior Approval terms that require clinical coverage criteria to be "based on current medical knowledge." *See, e.g. Alexander v. United Behavioral Health*, No. 14-cv-05337, 2015 WL 1843830, at *5-6 (N.D. Cal. April 7, 2015) (finding that allegations that internal criteria created by plan administrator failed to reasonably interpret the plan's requirement that such criteria be based on "generally accepted standards of care" plausibly suggested both breach of fiduciary duty and wrongful denial of benefits claims under ERISA).

Having the full Administrative Record in this case may unearth additional Dürr Plan terms that may have relevance here or may disclose that indeed these coverage criteria were incorporated into the Dürr Plan as "plan terms" and are unreviewable

matters of plan design. But even *Jones*, on which Defendants rely for the proposition

that unpublished coverage criteria can be incorporated into a plan as unreviewable

"plan terms," was decided in the trial court on summary judgment, not on a motion

to dismiss devoid of any context or an administrative record. While ultimately, when

a more robust record is explored in this matter, Plaintiff may not prevail at the

summary judgment stage, his Complaint plausibly suggests a claim for wrongful

denial of benefits under § 1132(a)(1)(B).[7]

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES Defendants' Motion to Dismiss

(ECF No. 10), and Orders Defendants to Answer Plaintiff's Complaint within

fourteen (14) days of entry of this Order. The Court will then issue its standard

ERISA Scheduling Order.

IT IS SO ORDERED.

Dated:  **JUN 0 6 2017**

Paul D. Borman
United States District Judge

---

[7] The Court also denies Defendants' motion to dismiss Plaintiff's claim under § 1132(a)(3). The Court recognizes that a claimant may not "repackage" a wrongful denial of benefits claim as a claim for breach of fiduciary duty under § 1132(a)(3). *See, e.g., Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 615 (6th Cir. 1998) ("Because § 1132(a)(1)(B) provides a remedy for Wilkins's alleged injury that allows him to bring a lawsuit to challenge the Plan Administrator's denial of benefits to which he believes he is entitled, he does not have a right to a cause of action for breach of fiduciary duty pursuant to § 1132(a)(3)."). However, given the nature of his claims, he may proceed on both fronts at this pleading stage.